**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NANCY DOLAN,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:09-2041** |
| **v.** | : | **(MANNION, D.J.)** |
| | | **(BLEWITT, M.J.)** |
| **PENN MILLERS INSURANCE CO.** | : | |
| **and PENN SOFTWARE &** | | |
| **TECHNOLOGY SERVICES** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Nancy Dolan spent approximately six years working for Penn Software and Technology Services (PSTS) as a sales account executive and sales manager. During those six years, her working relationship with one co-worker in particular, Michael Conway, was less-than-amicable. Over her final year with the company, their interactions became increasingly tense as Ms. Dolan alleged a marked rise in Mr. Conway's rudeness and crass behavior. Her boss, Frank Joanlanne, usually intervened on her behalf, but she claims he showed less concern for her complaints as he was heavily involved in the sale of PSTS. She also felt Mr. Conway and Mr. Joanlanne were excluding her from key decision-making meetings. Ms. Dolan filed complaints with PSTS's Human Relations Department, the Equal Employment Opportunity Commission (EEOC), and the Pennsylvania Human Resources Commission (PHRC) alleging gender discrimination. The company conducted an investigation and found her claims to be unfounded. Months after she filed her

complaint, PSTS was sold and the plaintiff's job was eliminated. She filed this suit claiming gender discrimination, retaliation, and "the cat's paw"[1] liability.

Presently pending before the court is a report and recommendation, (Doc. 70), to which the plaintiff has filed objections. (Doc. 71).[2] Judge Blewitt's report recommends that the defendants' motion for summary judgment, (Doc. 60), be granted. The plaintiff challenges the report in five respects: (1) the findings of fact do not conform with Fed. R. Civ. Pro. 56; (2) Defendant Penn Millers Insurance Co. (Penn Millers) is a proper defendant because it was a fully integrated enterprise with PSTS; (3) the plaintiff has established a *prima facia* case for a gender-based hostile work environment; (4) the plaintiff has presented sufficient evidence to sustain her claim of retaliation; and (5) the

_____

[1]Discussed more thoroughly below, "the cat's paw" is a theory of liability similar to respondeat superior. It arises when a coworker with a discriminatory purpose convinces a supervisor to terminate an employee. The coworker's improper motive is imprinted on the supervisor, regardless of his or her knowledge.

[2]The plaintiff filed a document entitled "Plaintiff's objections to Magistrate Judge's Report and Recommendation," (Doc. 72), and a memorandum of law in support of her objections. (Doc. 71). The plaintiff's objections appear to be more akin to a statement of material facts in opposition to a motion for summary judgment listed in numbered paragraphs. This does not comply with Local Rule 72.3 requiring objections to "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections." The plaintiff's objections do not comply with Local Rule 72.3 and will not be considered. However, the plaintiff's memorandum of law does detail several specific objections. The court will address the issues raised in that brief. (Doc. 71).

report erred by not analyzing "the cat's paw" liability.

For the reasons discussed below, the court will **ADOPT IN SUBSTANTIAL PART** Judge Blewitt's report and recommendations and the defendants' motion for summary judgment will be granted in full.

## I.    FACTUAL BACKGROUND

Before discussing the facts of the case, the court is compelled to address the plaintiff's response to the defendants' statement of material facts. (Doc. 60). This response is neither short, nor concise. It contains extensive rebuttals to many of the facts and additional information even when admitting a fact as true. Many of these immaterial and irrelevant rebuttal statements are argumentative and cite either to numerous pages of depositions, general volumes of documents, or contain no citation at all. The proper way to dispute a material fact is to present a cite to the record that tends to call into question the alleged undisputed fact, not engage in long-winded, unnecessary, and unsupported responses. Moreover, parts of the plaintiff's response are confusing and inconsistent. For example, in responding to paragraph 23 of the defendants' material facts (incorrectly numbered 22 in the plaintiff's response), the plaintiff first states the fact is "Admitted," then says "Denied as stated." (Doc. 64, p. 13).

It also appears the plaintiff may have written some of these responses herself. References to the plaintiff alternate between the first and third person

3

throughout this document, despite it having been submitted by counsel.[3] It also appears counsel left some of plaintiff Dolan's editorial comments in the document rather than removing them. There are a total of five such comments scattered throughout this filing. For example, on the fourth page, there is a note in the margin that reads: "Don should we take out this reference not sure it helps us...only PSTS moved to the Baltimore Drive location not penn millers...up to you." (Doc. No. 66, p. 4). That inquiry is linked to a statement that says in part "[t]he companies then moved to Baltimore Drive in Wilkes-Barre, PA . . . which is where they were located when the sale was made to Synergistics." (Id.). Unfortunately, counsel failed to correct this obvious factual error. Whether the companies maintain separate office spaces is significant given the plaintiff contests that Defendant Penn Millers and PSTS are a single entity. Filings should not contain communications between counsel and his client, however they should contain accurate information.

In sum, the plaintiff's responsive statement of material facts does not comply with Local Rule 56.1. Any facts that are summarily denied without proper citation to contrary evidence within the record are deemed admitted.

---

[3]For example, on page 13, it states "Therefore *my* being excluded from these meetings and future meetings regarding the company's strategic direction was inconsistent with what Joanlanne was telling *her* about *her* position and role." On the next page, one sentence reads in part, "Section 9 waived *her* right to recover damages from discriminatory practices, which *I* endured throughout *my* employment..."

Additional facts the plaintiff alleges without proper citation will not be considered. With those preliminary matters resolved, the court will now address the merits of the case.

The plaintiff's employment with PSTS began in 2003 when she was hired as a sales account executive. (Exh. 2, p. 24)[4]. During her time with the company, she reported to Frank Joanlanne, the President of PSTS. Approximately three years later she was promoted to the position of Sales Manager and began dealing directly with PSTS customers on a regular basis. She also received regular raises, regular bonuses, and generally received good reviews from Mr. Joanlanne throughout her five-year employment with the company. (Exh. 6, p. 160, 175).

The plaintiff worked with Michael Conway, the Manager of Network Services, throughout her time at PSTS. Mr. Conway nor Mr. Joanlanne ever made any sexual advances toward the plaintiff or engaged in any inappropriate sexual activity with her. The initial conflict between the plaintiff and Mr. Conway arose in 2004 after she complained to Mr. Joanlanne that Mr. Conway would not work with a woman. She also alleged he tried to exclude her from a single meeting with another employee. (Exh. 3, p. 12). In response, Mr. Joanlanne made it clear that Mr. Conway and the plaintiff were equals within the company.

---

[4]All references, unless otherwise noted, are to defendants' exhibits which were relied upon by the plaintiff and Judge Blewitt. (Doc. 60).

The plaintiff claims she made several complaints about Mr. Conway to Mr. Joanlanne throughout the years, but it is unclear when these complaints were made and the context of such complaints. (Exh. 5, p. 186). She claims that Mr. Conway ignored her during meetings, was non-responsive to her requests, was generally rude, would curse often within her earshot, and sometimes tried to exclude her from various meetings. (Exh. 3, p. 25; Exh. 4, p. 124-25). In terms of specific incidents, the plaintiff claims there were two meetings, one in 2004 and another in 2008, where Mr. Conway intentionally tried to exclude her. (Exh. 4, p. 135).

Sometime in the fall of 2007, Mr. Joanlanne and Penn Miller Holding Company began having secret discussions to sell PSTS. (Exh. 18, p. 19). A prospective buyer, Synergistics Networks, Inc., was interest in buying PSTS's book of business. During the negotiations leading up to the sale of PSTS, Synergistics requested the plaintiff sign a non-disclosure, non-raiding, and non-solicitation agreement (NDA). On November 14, 2007, Mr. Joanlanne gave the plaintiff the NDA. He said he wanted to tell her something and needed her to sign the NDA, but she refused to do so. The NDA reads in pertinent part:

> The seller and the employees of the Business to be employed by the Seller (or affiliate thereof) after the closing of the Transaction shall execute prior to such closing appropriate non-compete/non-disclosure/non-solicitation and confidentiality covenants to be made for the benefit of the Buyer. In addition, as a condition of the execution of the Definitive Agreement and the consummation of the Transaction, one of the Seller's key employees, Nancy

> Dolan shall have executed for the benefit of the Buyer, the Seller, and the affiliates of the Seller, a non-disclosure/non-solicitation/ agreement in form and substance satisfactory to the Buyer related to the Seller's customers/clients (the Non-disclosure/Non-solicitation Agreement, which Non-disclosure/Non-solicitation Agreement shall be for a term of no less than five (5) months from the date of Closing.

(Exh. 19). Mr. Joanlanne planned on offering the plaintiff a "stay-on" bonus if she signed the NDA, but because she did not, no bonus was offered. No other employee of PSTS was offered a stay-on bonus. Mr. Conway and Mr. Joanlanne both signed NDA agreements when the sale was subsequently finalized.

After refusing to sign the NDA, the plaintiff was allegedly excluded from various closed door meetings that she thought should have included her. She claims to have asked about the meetings and why she was not invited, but could not get an answer. The plaintiff avers there were as many as ten meetings between Mr. Conway and Mr. Joanlanne from which she was excluded between 2007 and 2008. (Exh. 4, p. 119). She does not know what was discussed in those meetings, but says she was involved in nearly all meeting prior to that time. Unbeknownst to her at the time, it appears these meetings involved the potential sale of PSTS to Sygeneristics.

According to the plaintiff, Mr. Conway's cursing increased significantly about the time she was presented with the NDA, but Mr. Conway never cursed directly at her. Despite the allegations against Mr. Joanlanne, the plaintiff recalls he would stick up for her, (Exh. 4, p. 121), make sure Mr.

Conway would not discriminate against her, (Id., p. 122), and when he became involved, Mr. Conway was kept on track and their work relationship would improve. (Id., p. 129).

On February 1, 2008, Mr Joanlanne presented the plaintiff with a Separation and General Release Agreement, which included a non-compete clause as part of a severance package. She would receive $21,807 in consideration for the severance and was given twenty days to accept or reject the offer. However, she was required to continue working at PSTS until the sale of the company was final and complete. The separation agreement notified the plaintiff that "PSTS has disclosed to Employees that it is in the process of attempting to sell substantially all the business assets of PSTS and that the Employee's employment is anticipated to be terminated by PSTS, effective as of the closing of such sale." The plaintiff did not sign this agreement within the twenty-day window and it was withdrawn.

On February 22, 2008, the plaintiff claimed that a contractor sexually harassed her. She reported the inappropriate sexual comments to Mr. Conway first, and then to Mr. Joanlanne. (Exh. 60, p. 47-48). That same day the contractor was fired and conducted no further business with PSTS. The plaintiff agreed that this response was adequate, appropriate, and timely. She does not allege any further inappropriate sexual conduct during the rest of her time with PSTS. (Id., p.46).

A little over a month later, the plaintiff sent Mr. Joanlanne a letter that

outlined the separation terms that would be agreeable to her. This included PSTS supporting the plaintiff's application for unemployment benefits, paying the plaintiff's full salary and estimated commissions (totaling $95,119 per year) for a maximum of three years or until she found other employment (for a maximum total of $285,357), paying for all earned vacation time, reimbursing her for any legal fees incurred in reviewing documents PSTS wished her to sign, three letters of recommendation, and $50,000 to pursue her MBA degree if she so desired. In making these demands, the plaintiff also alleged Mr. Conway had created a hostile work environment based on her gender. She also restated the sexual harassment by the contractor who had been previously fired. This was the first time the plaintiff explicitly brought the gender-based hostile environment claim to Mr. Joanlanne's attention.

On April 8, 2008, Mr. Joanlanne responded to the plaintiff's letter, stating that human resources would investigate her complaint. One week later, the plaintiff filed a complaint with the EEOC and PHRC. She notified Mr. Joanlanne of these filings on that same day. In those complaints, the plaintiff alleged she was demoted and she was excluded from various meetings.

The Assistant Vice President of Human Resources conducted an internal investigation into the plaintiff's gender discrimination and hostile work environment claims. The investigation included interviews with the plaintiff, Mr. Conway, and all PSTS employees. The probe revealed that Mr. Conway cursed often, both when the plaintiff was in his presence and when she was

outside his office. The investigation did not reveal any discrimination or retaliation against the plaintiff based on her gender. HR notified the plaintiff of the results in a letter dated June 2, 2008. The plaintiff claims the investigation should have been more thorough and should have taken her allegations more seriously.

On June 16, 2008, PSTS agreed to sell its business assets to Synergistics. Roughly two weeks later, the sale was finalized and all of PSTS's assets were transferred. On that same day the plaintiff received a letter from HR, notifying her that PSTS's business had been sold, that the purchasing company would not be retaining her services, and that her employment was terminated effective immediately. All of the other PSTS employees were terminated on that same day, while Mr. Joanlanne continued on with Penn Millers in his capacity as senior vice president. Some PSTS employees from the IT department were transferred to Penn Miller's IT department, but they did not hire anyone to fill the plaintiff's position because the sale of the business obviated any need for a sales manager.

Judge Blewitt made addition findings and concluded that PSTS and Penn Miller were separate entities. The plaintiff agrees that both Penn Miller and PSTS were owned by Penn Miller Holding Company, but argues that the evidence is sufficient to show that Penn Miller and PSTS were an integrated single entity. The plaintiff was an employee of PSTS and reported solely to Mr. Joanlanne, PSTS's president. (Exh. 2, p. 25). Mr. Joanlanne was both the

10

president of PSTS and a senior vice president at Penn Miller.

The human resources manager for Penn Miller Holding Company, managed all of the HR for both PSTS and Penn Millers. (Exh. 20, p. 4). PSTS was independently incorporated and had separate offices from Penn Miller, despite listing its corporate address at Penn Miller's Franklin Street location in Scranton. (Exh. 2, p. 31; Exh. 23). The plaintiff alleges that payroll was completed by Penn Miller, but her check came from PSTS. (Id., p. 32). She admitted that she was never an employee of Penn Millers. (Id.). Moreover, the sale involved only PSTS and affected only PSTS employees. (Exh. 21). The PSTS employees from the IT department were hired by Penn Millers after the sale, while some others were retained by Synergistics. (Exh. 16, p. 60; Exh. 19, p. 63). Finally, PSTS was a software and technology services company, while Penn Millers was an insurance company. The plaintiff neither had a license to sell insurance, nor was she ever qualified to sell insurance.

## II.    PROCEDURAL BACKGROUND

The plaintiff filed her four-count complaint against the defendants on October 11, 2009. (Doc. 1). The plaintiff's four causes of action are: (1) Gender Discrimination and (2) Retaliation in violation of Title VII, 28 U.S.C. §2000(e)(2)(a); along with state law claims of (3) Gender Discrimination and (4) Retaliation in violation of the Pennsylvania Human Relations Act (PHRA). The defendants filed a motion for summary judgment and a statement of

undisputed material facts on September 13, 2013. (Doc. 60). A brief in support was filed on September 27, 2013. (Doc. 61). The plaintiff filed her previously discussed response to the defendants' statement of material facts and a brief in opposition on October 30, 2013. (Doc. 65; 64). The defendants filed their reply brief on November 27, 2013. (Doc. 69).

Judge Blewitt filed a report and recommendation on January 22, 2014, (Doc. 70), to which the plaintiff filed objections on February 9, 2014. (Doc. 71). The defendants filed a brief in opposition to the plaintiff's objections on March 5, 2014. (Doc. 75). The case is now ripe for the court's ruling.

## III.   STANDARD OF REVIEW

When objections are timely filed to the report and recommendation of a magistrate judge, the district court must review *de novo* those portions of the report to which objections are made. 28 U.S.C. §636(b)(1); *Brown v. Astrue,* 649 F.3d 193, 195 (3d Cir. 2011). Although the standard is *de novo*, the extent of review is committed to the sound discretion of the district judge, and the court may rely on the recommendations of the magistrate judge to the extent it deems proper. *Rieder v. Apfel,* 115 F.Supp.2d 496, 499 (M.D.Pa. 2000) (*citing United States v. Raddatz,* 447 U.S. 667, 676 (1980)).

For those sections of the report and recommendation to which no objection is made, the court should, as a matter of good practice, "satisfy itself that there is no clear error on the face of the record in order to accept the

12

recommendation." Fed. R. Civ. P. 72(b), advisory committee notes; see also *Univac Dental Co. v. Dentsply Intern., Inc.,* 702 F.Supp.2d 465, 469 (M.D.Pa. 2010) (*citing Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987)* (explaining judges should give some review to every report and recommendation)). Nevertheless, whether timely objections are made or not, the district court may adopt, not adopt, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. §636(b)(1); Local Rule 72.31.

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law*. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen,* 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *see also Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d

Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); see also *Celotex*, 477 U.S. at 325.  If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp*., 477 U.S. at 322-23*; Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

14

## IV.   DISCUSSION

### A.   The Factual Findings

The plaintiff first contends that Judge Blewitt improperly weighed the evidence in finding that the plaintiff was not terminated and that PSTS and Penn Millers are separate and distinct entities. (Doc. 71). The court disagrees. When the defendants point to evidence within the record in support of a factual statement, the plaintiff cannot rely on a mere denial to create an issue for trial. "It is the burden of the parties, in this instance, the [plaintiff], not the court, to properly frame the action through facts which are sufficient to support [her] claims." *Morris v. Kesserling*, 2010 WL 4362630, *2 (E.D.Pa. October 27, 2010). The court will not sift through volumes of briefs, transcripts, and other documents to determine what properly-cited facts the plaintiff actually relies upon in making her arguments. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)(per curiam)("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a passel of other arguments, as [the plaintiff's] did. Judges are not like pigs, hunting for truffles buried in briefs." (internal citation omitted)). Judge Blewitt properly reviewed the material facts in light of plaintiff's improper denials and a lack of proper record citation.

The plaintiff specifically complains about Judge Blewitt's determinations on two matters: whether the plaintiff was terminated and the integration of PSTS and Penn Millers. In objecting to the report's factual findings as to her

"termination", the plaintiff points to several facts including (1) the letter of July 3, 2008 ending her employment; (2) the 2007 NDA agreement she was asked to sign; and (3) the general "murky determinations" that led to her termination. The court will address each of her contentions in turn.

### B.    The Plaintiff's "Termination"

The plaintiff focuses the court's attention on the word "terminate" in the July 3, 2008 letter. The letter came on the same date PSTS transferred all of its business to Synergystics per their June 16 sale agreement. The plaintiff admits she was only terminated after the sale, once PSTS was no longer a viable entity because of Synergistics's acquisition. (Exh. 4, p. 4). The July 3, 2008 letter ending plaintiff's employment states: "As you are aware [PSTS] has been sold effective July 3, 2008. The purchasing company will not be retaining you as an employee; therefore your employment is terminated effective July 3, 2008." (Exh. 14, p. 4). PSTS further notified the plaintiff of this highly likely outcome on February 1, 2008, when the separation agreement was discussed. Mr. Joanlanne confirmed that the plaintiff's position was terminated because of the sale, but admitted that some other employees were hired by Synergistics and Penn Millers. (Exh. 18, p. 31).

There is no dispute PSTS was sold and was essentially an empty shell as of the day the sale was completed. As such, the plaintiff was not fired from a job that was still available, rather she was terminated because the company

16

where she had worked for no longer existed. Whether other employees were hired by Penn Millers or Synergistics is of no moment here as PSTS had no work left to perform. There are no disputed facts regarding the sale of PSTS to Synergistics and its effect on the existence of PSTS. No reasonable jury could find the plaintiff was terminated based upon gender discrimination or retaliation.

The plaintiff also points this court to the NDA as evidence of gender discrimination. Given the above findings, the only adverse action was the end of her employment with PSTS. There is nothing to indicate how her refusal to sign the NDA led to her role being assumed by Synergistics personnel after the sale. Finally, the court does not find the plaintiff's argument about "murky determinations" to be persuasive. There is nothing to show the sale of PSTS was in anyway motivated by the plaintiff's gender or how any decisions relating to the sale had discriminatory underpinnings.

C.   PSTS and Penn Millers are Separate Entities

The plaintiff also objects to the recommendation that summary judgment should be granted in favor of Defendant Penn Miller because it is not a proper defendant. "In order to state a Title VII claim, [the plaintiff] must allege an employment relationship with the defendants." *Covington v. International Ass'n of Approve Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013). The employment relationship is analyzed in light of several factors in determining

17

who exercised control over the employee. These factors focus on: (1) who paid the employees salary; (2) who hired and fired the employee; and (3) who had control over the employees daily activities. *Id.* (citing *[Nationwide Mutual Insurance Co. v. Darden](#)*, 503 U.S. 318 (1992)). In *Covington*, the Third Circuit held that a school district that assigned, scheduled, and paid referees for basketball games was an employer for Title VII purposes. In determining another entity was not an employer, the court specifically pointed out that it "does not pay officials and does not contribute to their training or evaluation." *[Covington](#)*, 710 F.3d at 119.

The plaintiff points this court to a case out of the D.C. Circuit Court of Appeals, *[Sibley Memorial Hospital v. Wilson](#)*, 488 F.2d 1338 (D.C.Cir.1973), arguing that because the nurse in that case was paid independently by patients and could bring an Title VII claim at the hospital where he worked, Defendant Penn Millers is a proper party. The Third Circuit clarified the *Sibley* ruling recently, noting the nurse "was deemed *not* an employee of the hospital, although he was protected by Title VII because the hospital blocked his access to employment." *[Plaso v. IJKG, LLC](#)*, 2014 WL 212589, \*4 (3d Cir. 2014). Here, as in *Plaso*, Defendant Penn Millers was not the plaintiff's employer and had only minimal interaction with the plaintiff through company-wide benefits along with other HR functions. There is nothing to indicate that Defendant Penn Millers controlled, directed, or influenced the plaintiff's employment in any way. Moreover, Penn Millers had no duty to hire the

18

plaintiff after her job duties were eliminated as of the date of the sale to Synergistics. In sum, *Sibley* is not persuasive or applicable to the facts of the instant case.

Despite sharing an HR department and Mr. Joanlanne's position as an executive vice president at Penn Millers, the plaintiff herself admits she was only an employee of PSTS. Her paycheck came from PSTS and she worked exclusively for PSTS. PSTS had its offices in Wilkes-Barre, while Defendant Penn Millers maintained its location in Scranton. When PSTS was sold, the plaintiff's position was eliminated. She admits her work was not transferred to anyone at Penn Millers, but was assumed by employees at Synergistics. (Doc. 64, p. 21). Lastly, there is nothing to indicate that Mr. Joanlanne directed the plaintiff to do any activity on behalf of Defendant Penn Millers or that her work in any way involved interaction with that entity. Every agreement, including the proposed NDA and separation agreement, were between the plaintiff and PSTS. As such, Penn Millers is not a proper defendant and will be granted summary judgment.[5]

---

[5] The *Darden* court laid out an exhaustive list of factors to be considered, including:

the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work...the hired party's role in hiring and paying assistants; whether the work is part of the

19

D.    The Title VII Hostile Environment Claim

To sustain a *prima facia* hostile work enviroment claim, a plaintiff must establish five elements: "(1) that she suffered intentional discrimination because of her sex, (2) that the discrimination was severe or pervasive, (3) that the discrimination detrimentally affected her; (4) that the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) that a basis for employer liability is present." *Theriault v. Dollar General*, 336 F. App'x 172, 174 (3d Cir. 2009). "A plaintiff may base her claim of discrimination on a mixed-motive theory by showing that an adverse employment decision was based on both legitimate and illegitimate reasons." *Cange v. Philadelphia Parking Authority*, 451 F. App'x 210, 213 (3d Cir. 2011)(citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240–42 (1989)). "This requires a showing that the defendant took an adverse employment

---

> regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*503 U.S.* at 323-34. The Third Circuit recently noted that all the factors need not be equally weighed, but should be reviewed in light of the circumstances of a particular case. *Plaso*, 2014 WL 212589, *3. PSTS provided the plaintiff with an office separate from Penn Millers, there is no evidence the plaintiff did any work on Penn Millers behalf, Mr. Joanlanne was the plaintiff's only supervisor and was president of PSTS, and the work of PSTS and Penn Millers is different given one is a software company and one is an insurance firm. The sharing of benefits and possible other crossover are insufficient to show they were an integrated enterprise for Title VII purposes.

20

action against the plaintiff, and that [gender] was a motivating factor for the defendant's action." *Id.*

"In determining if a work environment is 'hostile' or 'abusive,' courts look to the totality of the circumstances, including: the frequency and severity of the conduct; whether the conduct is physically threatening or humiliating, or merely an offensive utterance; and whether the conduct unreasonably interferes with the victim's work performance." *Pittman v. Correctional Healthcare Solutions, Inc.*, 868 F.Supp 105, 108 (E.D. Pa. 1994)(citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)). The circumstances and alleged incidents of harassment are to be taken together and as a whole rather than parsed out individually and scrutinized. *Mandel v. M&Q Packaging Corp.*, 706 F.2d 157, 168 (3d Cir. 2013).

The plaintiff claims the report and recommendation evaluated the hostile work claim under a sexual harassment framework, rather than as a gender discrimination claim. Although this argument may have merit, the plaintiff has failed to present sufficient proof to sustain her claim under either analysis. The substance of the plaintiff's argument is that she suffered an adverse employment decision by being excluded from as many as 10 meetings and having to endure working with Mr. Conway. She also alleges she was owed a bonus in 2008 that she did not receive.

In *Wood v. University of Pittsburgh*, 395 F. App'x 810, 815 (3d Cir. 2010), the Third Circuit discussed how a gender discrimination claim cannot

21

stand when a plaintiff merely claims her workplace was interfered with, the investigation into her allegations was insufficient, and "her coworkers 'acted differently' toward her and treated her with disrespect in office meetings." A plaintiff may not merely assert that coworkers or other employees "acted differently" around him or her, but must show a causal link between the activity and his or her gender. *Id.* In *Woods*, the Third Circuit held that such vague assertions, similar to those present in this case, were insufficient as a matter of law to sustain a Title VII gender discrimination case.

*Brown-Baumbach v. B&B Automotive, Inc.*, 437 F.App'x 129, 134 (3d Cir. 2011) provides a contrast to *Woods*. In that case, a series of both offensive sexual comments (text messages about underwear, plaintiff being called a "mother fucking bitch") and negative actions that were sexually neutral (throwing plaintiff's papers on the floor) that occurred over a four-month period were sufficient to establish a *prima facia* claim of a hostile work environment. The court noted given the frequency, nature, and relatively short time frame, these hostile actions did not constitute the regular tribulations of an office environment, but raised a material issue of fact as to whether they were based on the plaintiff's gender. *Id.* In this case, there are no sexual harassment charges or any overt actions referring to the plaintiff's gender, save for the contractor who was expeditiously terminated after the plaintiff complained.

The court has reviewed the plaintiff's deposition and exhibits. It is of

22

note that the plaintiff gives only general conclusions about the nature of the work environment, failing to identify specific instances of conduct. The two times that the plaintiff was excluded from meetings by Mr. Conway and the possible other ten exclusions from meetings regarding the sale of PSTS, the cursing, and the allegedly rude conduct of Mr. Conway taken together do not amount to a sufficiently pervasive or hostile work environment. Mr. Conway allegedly excluded the plaintiff from one meeting each in 2004 and 2008, nearly four years apart. The ten meetings, of which the plaintiff only speculated about the subject matter prior to this suit, occurred while the negotiations to PSTS were taking place. The plaintiff admits Mr. Conway's cursing was never directed at her and was not sexual in nature. Lastly, although Mr. Conway may have been rude toward the plaintiff, she has not directed this court to any evidence from which an inference could be made it was based on her gender. The mere existence of an uneasy and difficult relationship between a male and female co-worker is insufficient to establish a *prima facia* case of gender discrimination.

As discussed previously, the plaintiff admitted that Mr. Joanlanne responded to her complaints, engaged with Mr. Conway, and "would...be there to make sure [Mr. Conway] knew to treat me as an equal." (Exh. 5, p. 172). The plaintiff's pay was never reduced, she was never demoted, and she was only terminated when PSTS went out of business. Even her proposed separation agreement, created at a time the plaintiff alleges she was being

23

forced out, offered her a $21,000 bonus while she worked through the completion of the sale. When she made a formal complaint against Mr. Conway, the HR department intervened and conducted an investigation. It is insufficient to merely assert the investigation, conducted by a female HR representative, was insufficient. These facts do no support allegations of a hostile work environment created by PSTS. As such, summary judgment will be granted on the gender discrimination claim.

### E.    The Title VII Retaliation Claim

"[T]o advance a prima facie case of retaliation [in violation of Title VII], a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action.**"** *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). Here, it appears the parties agree that the first two elements are met. The plaintiff filed a report of gender discrimination with HR and the EEOC. Moreover, she lost her job only a few months after making that report.

The central question is whether the plaintiff has presented sufficient evidence to show a causal link between her "termination" and the protected activity. Here, the protected activity occurred at the latest in April 2008, so only those actions that occurred after may be considered. Although not

explicitly argued, the plaintiff appears to contend that the temporal proximity of her complaint, the conclusion on June 2, 2008 of the HR department's investigation, and the plaintiff's termination one month later is sufficient to create a presumption of causation. (Doc. 65).

The protected activity occurred when the plaintiff filed complaints with HR, the EEOC, and the PHRA, not when the HR investigation was complete. *See Moore v. Shinseki*, 487 F. App'x 697, 698 (3d Cir. 2012)(noting protected activity linked to filing of a complaint with EEOC not dismissal of that complaint). As such, a temporal proximity of three months here does not create a presumption of causation. *See Id.* ("Two months is not so close to be unduly suggestive of causation."). Further, the defendants have produced abundant evidence that PSTS's business was purchased by Synergistic and that all employees were effectively terminated on July 3, 2008 because the company no longer existed. The fact that a third-party company, or Penn Millers for that matter, hired some of those terminated individuals does not support her contention of retaliation. In sum, the plaintiff has produced insufficient evidence to casually link her termination to her protected activity. Summary judgement will be granted on the Title VII retaliation claim.

F.    The Cats Paw Liability

The court must last deal with a theory of liability, labeled as "the cat's paw" liability, raised in both the plaintiff's brief in opposition to summary

25

judgment and her objections to the report and recommendations. The plaintiff

quotes a case out of the Seventh Circuit, *Cook v. IPC Int'l Corp.*, 673 F.3d

625, 629 (7th Cir. 2012), without explaining how it is relevant to the court's

analysis or applicable to the facts presented here. As Judge Posner

discussed in *Cook*, "the cat's paw" is a strangely named theory of liability that

often confuses both judges and lawyers without proper explanation and

context. Based on the court's own research, "the cat's paw" is invoked when

an employee with a discriminatory purpose essentially convinces a supervisor

to take an adverse action against another employee.[6] It imprints the improper

motive on the supervisor as a form of respondeat superior, regardless of the

superior's knowledge.

The plaintiff does not explain the roles of each party within "the cat's

paw." It appears the plaintiff alleges that the discriminatory motive of Mr.

Conway, who would be the clever monkey in this situation, influenced Mr.

Joanlanne, who has assumed the role of the cat. Based on this theory, Mr.

Conway allegedly convinced Mr. Joanlanne to unwittingly reach into the

figurative fire and burn his paw. The plaintiff claims this discriminatory motive

is what pushed Mr. Joanlanne to require the plaintiff to sign the NDA, to

---

[6]Judge Posner explained the origins of the theory: "In the fable of the
cat's paw...a monkey who wants chestnuts that are roasting in a fire
persuades an intellectually challenged cat to fetch the chestnuts from the fire
for the monkey, and the cat does so but in the process burns its paw." *Cook*,
673 F.3d at 628.

exclude her from meetings, and to terminate her upon the sale of PSTS. There is no evidence, save for the plaintiff's bare conclusions, that Mr. Conway had any discriminatory purpose that was motivated by gender. This portion of the plaintiff's argument was thoroughly discussed above in relation to the gender discrimination claim.

Moreover, no evidence supports the contention that Mr. Conway in any way influenced Mr. Joanlanne's actions. "The cat's paw" does not even make it into the fire. Summary judgment will, therefore, be granted.

### G.   PHRA Claim

Given that summary judgment will be entered in favor of the defendants on all of the federal claims, the only remaining claims are those arising under the PHRA. "The analysis required for adjudicating plaintiffs claim under the PHRA is identical to a Title VII inquiry." *Yeager v. UPMC Horizon*, 698 F.Supp.2d 523, 535 n.2 (W.D.Pa. 2010)(citing *Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 539 n. 5 (3d Cir.2006); *Goosby v. Johnson & Johnson Medical*, 228 F.3d 313 (3d Cir.2000)). The resolution of the plaintiff's Title VII claims are dispositive of the plaintiff's PHRA claims as well. As such, summary judgment is appropriate.

## V.    CONCLUSION

For the reasons discussed above, Judge Blewitt's report and

recommendation, (Doc. 70), **IS ADOPTED IN SUBSTANTIAL PART**. The defendants' motion for summary judgment, (Doc. 60), is **GRANTED**. An appropriate order will follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**Date: May 19, 2014**